# EXHIBIT 1

IN THE 69th DISTRICT COURT
HARTLEY COUNTY, TEXAS

| | | |
|---|---|---|
| SILVIA GARCIA RODRIGUEZ, as Administrator of the ESTATE of MARCO ANTONIO GALVAN and Individually on behalf of All Statutory Death Beneficiaries of MARCO ANTONIO GALVAN, and as next of friend to M.M.G.G.; <br><br> Plaintiff, <br><br> v. <br><br> BLAINE LARSEN FARMS INC. <br><br> Defendant. | § § § § § § § § § § § § § § § | CAUSE NO. 5422H <br><br><br> Jury Demand |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, SILVIA GARCIA RODRIGUEZ, as Administrator of the ESTATE OF MARCO ANTONIO GALVAN; and Individually and on behalf of All Statutory Death Beneficiaries, and as next friend to M.M.G.G. who files this Original Petition against BLAINE LARSEN FARMS, INC., Defendant.

### I. INTRODUCTION

1. Marco Antonio Galvan died while working for Defendant as a result of Defendant's actions. This civil action arises under common law, the Texas workmen's compensation statute, and Tex. Civ. Prac. & Rem. Code Chapter 71. Plaintiff's claims include negligence, gross negligence, wrongful death, loss of consortium, and a survival action.

2. Mr. Galvan was in his forties when he died and was the sole earner for his family. He left behind his widow, Silvia Garcia Rodriguez, and his teenage daughter, M.M.G.G.

### II. DISCOVERY LEVEL

3. Pursuant to Rule 190.1 of the Texas Rules of Civil Procedure, Plaintiff gives notice to pursue a discovery control plan pursuant to Rule 190.3 (Level 3).

*Plaintiffs' Original Petition and Request for Disclosure*    PAGE 1

## III. PARTIES

### A. Plaintiff

4.  Plaintiff, **SILVIA GARCIA RODRIGUEZ**, as Administrator of the ESTATE OF MARCO ANTONIO GALVAN; and individually and on behalf of all statutory death beneficiaries of MARCO ANTONIO GALVAN, is a resident of Mexico. This suit is also brought in her individual capacity and in her capacity as the widow (ergo, a surviving beneficiary) of MARCO ANTONIO GALVAN. This suit is also brought in her capacity as next of friend of M.M.G.G., her and Mr. Galvan's minor daughter.

### B. Defendant

5.  Defendant, BLAINE LARSEN FARMS, INC. (hereinafter "Blaine Larsen"), is a large potato production corporation doing business over thousands of acres in Hartley and Dallam counties. It may be served on its registered agent, **Registered Agents, Inc., 5900 Balcones Drive, Suite 100 Austin, Texas 78731.**

## IV. JURISDICTION AND VENUE

6.  This Court has jurisdiction over this matter in that facts giving rise to the claims made herein occurred in Hartley County, Texas and the amounts sought exceed the minimum jurisdictional limits of the Court.

7.  Venue is proper in Hartley County, Texas, pursuant to Sections §§15.001 *et. seq.* of the Texas Civil Practice and Remedies Code.

## V. STATEMENT OF FACTS

8.  Marco Antonio Galvan was a skilled farmworker who worked for over seven seasons with Defendant in Hartley and Dallam counties from 2012 to July 2020.

9. Defendant controlled the scope of the work performed by all its employees (including the deceased, Mr. Galvan). Defendant also controlled the housing and access to transportation, medical care, and provisions of Mr. Galvan.

10. An agricultural employer in the United States may import foreign workers to perform labor of a temporary nature if the U.S. Department of Labor (DOL) certifies that: (1) there are insufficient available workers within the United States to perform the job; and (2) the employment of foreign workers will not adversely affect the wages and working conditions of similarly-situated U.S. workers. 8 U.S.C. § 1101(a)(15)(H)(ii)(a). Foreign workers admitted in this fashion are commonly referred to as "H-2A workers."

11. Defendant hired Mr. Galvan on an annual basis through the H-2A visa program.

12. Agricultural employers seeking admission of H-2A workers must submit a temporary labor certification application to the DOL pursuant to 20 C.F.R. §655.130. That application requires the employer to set forth the terms and conditions of work that the employer is offering to the foreign workers it seeks to hire. *Id.*

13. The terms of the agreement – as represented to the federal government – require Defendant to provide Mr. Galvan with free housing with access to buy food or provision of meals, and access to transportation for necessities, including to obtain medical care. Defendant understood when it hired Mr. Galvan, that it would be responsible for these items because he was a migrant H-2A farmworker living on its remote farm without access to basic necessities.

14. Mr. Galvan did not have access to transportation or housing of his own – he was dependent on Defendant during all times that Mr. Galvan lived and worked in Dalhart, Texas.

15. Mr. Galvan arrived at Blaine Larsen in Dalhart, Texas on July 2, 2020. By that time, Defendant had experienced rolling outbreaks of COVID-19 within its workforce since March or April of 2020.

16. Mr. Galvan went to work in July in the packing shed – where potatoes are processed for shipment.

17. Defendant did not inform Mr. Galvan of the prior COVID-19 outbreaks and did not inform him of the risk of COVID-19 in the workplace.

18. Mr. Galvan started experiencing symptoms of COVID-19 on July 10, 2020. He informed Blaine Larsen of his symptoms, but Defendant did not provide Mr. Galvan with access to transportation or inform Mr. Galvan of his right to seek medical care.

19. By July 10, 2020, Blaine Larsen was already housing dozens of employees in "quarantine housing" throughout its property near Dalhart, in Dallam County, Texas.

20. Mr. Galvan was unable to go to work from July 10 to July 14 because of his illness. During this time, he remained in Defendant's regular worker housing where he lived with other H-2A employees who were working for Defendant on a daily-basis – putting those workers at risk.

21. On July 14, Mr. Galvan's supervisor asked him why he missed work. Mr. Galvan informed this supervisor that he was ill. The recruiter said Mr. Galvan would have to go back to work that day; but could work outside rather than in the packing shed.

22. On July 14, after attempting to work as instructed, Mr. Galvan asked Defendant's human resources employee if he could go home to Mexico to recover from what he believed to be COVID-19. The human resources employee told Mr. Galvan that he was not permitted to leave. She did tell him, though, that he could leave the company property to go to a local clinic.

23. On July 15, Defendant loaned a company truck to Mr. Galvan and other workers who were also exhibiting symptoms of COVID-19 to go to the local clinic. Mr. Galvan was informed by the clinic later that day that he tested positive for COVID-19.

24. In response, Defendant told Mr. Galvan and other H-2A workers that they would have to remain on Defendant's property but move to quarantine housing and trailers. Defendant moved Mr. Galvan to a trailer with three other workers.

25. Defendant did not provide its quarantined workers with food or supplies. Defendant did not regularly monitor the sick workers. Defendant did not provide medical care to their sick employees.

26. Defendant did not provide Mr. Galvan with food while in quarantine housing. Defendant did not provide Mr. Galvan with access to medical care. Defendant did not monitor Mr. Galvan's condition while he was in quarantine housing. Nor did Defendant provide Mr. Galvan with access to a vehicle to obtain those things.

27. From July 15 to July 20, Mr. Galvan's condition deteriorated significantly while in the isolation trailer. Mr. Galvan spent most of July 19 and early July 20 coughing alone in his bed. At some point, he became unresponsive. Finally, on the morning of July 20, his roommates sought out Defendant to inform them that Mr. Galvan was seriously ill.

28. On July 20, Defendant finally called emergency medical services to treat Mr. Galvan. By the time the first responders arrived at Defendant's trailer, deep inside Defendant's isolated labor camp, Mr. Galvan was dead.

29. Defendant owed its employees the duty to use reasonable care to make sure that employees who suffered illness or injury while at work would have access to medical care – particularly when an employee is incapable of acting on his own.

30. Defendant's negligence and gross negligence in quarantining Mr. Galvan on their remote and unmarked property, and then failing to monitor and transport Mr. Galvan to appropriate medical care caused Mr. Galvan to die. Defendant's negligence and gross negligence in failing to

provide basic supplies to Mr. Galvan caused Mr. Galvan to die. The acts and/or omissions of Defendant proximately caused the death of Mr. Galvan.

31. Defendant knew and, in the exercise of reasonable diligence, should have known, that there was a serious likelihood that Mr. Galvan would require hospitalization. Defendant knew and should have known that the conditions under which Mr. Galvan was set up in quarantine housing would likely cause death or serious bodily injury.

32. Viewed objectively, leaving Mr. Galvan in isolated and unmarked quarantine housing, and without ensuring quick access to medical care, posed an extreme degree of risk to Mr. Galvan.

33. Defendant had actual awareness of the extreme risks of harm to Mr. Galvan. By July 15, 2020, Defendant already had several COVID-19 outbreaks roll through its workforce. By July 15, 2020, Defendant already knew at least one of its employees had died from COVID-19 in previous months and several other employees were hospitalized for the same. By July 15, 2020, Defendant had actual knowledge that Mr. Galvan was suffering from severe COVID-19 symptoms.

34. Nevertheless, Defendant proceeded with its acts or omissions – quarantining employees without arranging for medical monitoring and providing food in remote areas of Dallam and Hartley County – to demonstrate conscious indifference to the extreme risk of harm to Mr. Galvan.

35. Defendant's actions or omissions departed from the ordinary standard of care to such an extent that it created an extreme degree of risk of harm to Mr. Galvan.

36. Specifically, Defendant was negligent and grossly negligent because it:

    (A)    failed to hire a properly trained person to make sure that safe practices were implemented at the work site;

    (B)    failed to sufficiently train its employees on how to safely carry out their work;

    (C)    failed to rescue Mr. Galvan;

    (D)    failed to maintain the workplace in a safe condition;

    (E)    failed to inspect and correct dangerous conditions;

    (F)    failed to warn of the dangerous conditions;

    (G)    failed to supervise the work properly;

    (H)    failed to give adequate warnings to employees of the risk of COVID-19 outbreaks on the job;

    (I)    failed to follow OSHA regulations and other standards of care set forth by the Centers for Disease Controls regarding how to ensure safety of migrant farmworkers;

    (J)    failed to provide first aid facilities to the workers;

    (K)    failed to have a nurse or another sufficiently trained medical care-provider on site and available to Mr. Galvan;

    (L)    failed to attend to Plaintiff's injuries and damages after learning of his injuries;

    (M)    failed to provide reasonable access to medical services; and

    (N)    failed to monitor Mr. Galvan's conditions or provide him with basic necessities as he suffered from COVID-19 in the isolated quarantine housing.

37. In addition, when Defendant required Mr. Galvan to remain in quarantine housing on its isolated property, Defendant undertook a duty to monitor and ensure Mr. Galvan's access to medical care to treat his COVID-19 symptoms. When Defendant undertook this duty, it knew or should have known that continued health monitoring of Mr. Galvan as he suffered from COVID-19 was necessary to ensure his protection. Defendant failed to provide Mr. Galvan with those services. Mr. Galvan – gravely ill, and dependent on Defendant for all his basic necessities – relied

on Defendant's duty to take care of Mr. Galvan. Defendant's failure to monitor and provide basic medical services to Mr. Galvan increased the risk of death suffered by Mr. Galvan.

38. Finally, Defendant promised Mr. Galvan – pursuant to his work contract – free housing with access to buy food or provision of meals, and access to transportation for necessities, including to obtain medical care. Mr. Galvan accepted Defendant's contract by traveling to Dalhart, Texas to work for Defendant. Defendant failed to provide Mr. Galvan access to buy food or provisions and failed to provide him with access to medical care – thereby breaching its contract.

39. The acts and omissions of Defendant proximately caused the death of Mr. Galvan. Damages are far in excess of the minimum jurisdictional limits of the Court.

## VI. CAUSES OF ACTION

### A. WRONGFUL DEATH

40. This suit is brought under the Wrongful Death Statute of the State of Texas provided in Section 71.004 of the Texas Civil Practice and Remedies Code. It is brought on behalf of all statutory beneficiaries. They are seeking all damages available to them under law.

### B. SURVIVAL CLAIM

41. Silvia Garcia and M.M.G.G. are surviving heirs of the Plaintiff-decedent, Marco Antonio Galvan. Silvia Garcia is the executor of the Estate of Marco Antonio Galvan. Ms. Garcia, and M.M.G.G., are each entitled to recover for the conscious pain and suffering of Marco Antonio Galvan before he died.

### C. NEGLIGENCE

42. The actions of Defendant, as set forth above, constituted negligence.

### D. NEGLIGENT ENTRUSTMENT

43. The actions of Defendant, as set forth above, constituted negligent entrustment.

### E. GROSS NEGLIGENCE

44. The actions of Defendant, as set forth above, constituted gross negligence. This is brought under common law and, in the event the Court finds that Mr. Galvan's death is compensable under the Worker's Compensation Act, pursuant to Tex. Lab. Code 408.001(b).

### F. Loss of Consortium

45. Ms. Garcia is the surviving spouse of Mr. Galvan. Ms. Garcia is entitled to recover against Defendant for loss of love, guidance, association, companionship, comfort, and society due to Mr. Galvan's death.

### G. Breach of Contract

46. The actions of Defendant, as set forth above, constituted a breach of contract.

### VII. JURY DEMAND

47. Plaintiffs are entitled to and request a trial by jury.

### VIII. RULE 47 STATEMENT

48. Plaintiffs seek to recover all of their damages in an amount which the jury determines to be just and appropriate, based on the jury's discretion and judgment in its role as the trier of fact. In order to comply with the Supreme Court's requirement to state the range of damages, pursuant to Texas Rule of Civil Procedure 47(c), Plaintiffs plead that, at this time, they anticipate that the amount of damages they will request the jury to assess at trial will be monetary relief over $1 million USD.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs request that Defendant be cited to appear and answer and that upon final trial, Plaintiffs be awarded:

(a) Actual damages as may be awarded by the trier of fact;

(b) Exemplary damages as may be awarded by the trier of fact;

(c) Prejudgment and post-judgment interest as allowed by law;

(d) Costs of suit; and

(e)     Such other and further relief, at law or in equity, to which Plaintiffs may be justly entitled.

Dated: February 12, 2021

Respectfully submitted,

Texas RioGrande Legal Aid, Inc.
1331 Texas Ave.
El Paso, TX 79902
Fax: (915) 533-4108

**/s/ Christopher Benoit**
Texas Bar No. 24068653
(915) 585-5118
cbenoit@trla.org

ATTORNEY FOR THE ESTATE OF
MARCO ANTONIO GALVAN

WOOD LAW FIRM, LLP

/s/ Channy F. Wood
Channy F. Wood
SBN 00791954
E-mail: cwood@woodlawfirm-tx.com
Leslie Owens
SBN 24073561
E-mail: lowens@woodlawfirm-tx.com
Physical: 610 S.W. 11th Avenue (79101)
Mailing: P.O. Box 1439
Amarillo, Texas 79105-1439
Telephone: 806.372.9663
Facsimile: 806.372.9664

ATTORNEYS FOR STATUTORY DEATH
BENEFICIARIES OF MARCO ANTONIO
GALVAN